UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMIBA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| INFORMATION ASSOCIATED WITH ) | Misc. No. |
| gtn_jamesbond@yahoo.com ) | |
| fountain_man@yahoo.com ) | |
| schwanb@yahoo.com ) | |
| ) | |
| THAT IS STORED AT PREMISES ) | |
| CONTROLLED BY YAHOO, INC. ) | |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Laura R. Calvillo, Special Agent of the Federal Bureau of Investigation (FBI), Washington, D.C., Field Office, Northern Virginia Resident Agency, being duly sworn, depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by YAHOO, INC., an email service provider headquartered at 701 First Avenue, Sunnyvale, CA 94089. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require YAHOO, INC. to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2. I am a Special Agent with the Federal Bureau of Investigation and have been since March of 2016. I am currently assigned to the Washington Field Office, Northern Virginia

1

Resident Agency. Prior to joining the FBI, from October 2007 through March 2016, I was a Special Agent for the U.S. Army Criminal Investigation Division, and assigned to investigate violations of federal law to include violations involving child pornography and the sexual exploitation of children. Currently, as an FBI Special Agent, I investigate federal violations concerning kidnapping, child pornography, the sexual exploitation of children, human trafficking, and related offenses.

3. As a federal agent, I am authorized to investigate violations of United States laws and to execute search warrants issued under the authority of the United States. I have gained experience in such investigations through formal training and on-the-job training with more experienced agents. I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, and a variety of other investigative tools available to law enforcement officers.

4. The information in this Affidavit is based on my investigation, training, knowledge, and experience, and through information that has been related to me through data, reports and other officers or agents involved in this investigation and related subject area. Because this affidavit is being made for the limited purpose of securing a search warrant, I have not included each and every fact known to Your Affiant.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the following statutory provisions have occurred: Title 18, United States Code Sections 2252 (Activities Relating to Material Involving the Sexual Exploitation of Children), and 2252A (Activities Relating to Material constituting or Containing Child Pornography). I have reason to believe that the member accounts that are the subject of the instant application will have stored information and

communications that are relevant to this investigation. Thus, as outlined below, and based on my training and experience, there is probable cause to search the information described in Attachment A for evidence, fruits and/or instrumentalities of these crimes further described in Attachment B.

## JURISDICTION

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States for the District of Columbia has jurisdiction over the offenses being investigated.

## PROBABLE CAUSE

7. Leading up to Thursday January 12, 2017, Task Force Officer (TFO) Timothy Palchak was acting in an undercover capacity ("UC") as part of the Federal Bureau of Investigation Child Exploitation Task Force. The UC posted numerous online bulletin messages on specific social media forums, which based on the UC's experience, are websites that are frequented by individuals who have a sexual interest in children and incest. The bulletin messages were intended to attract individuals with a sexual interest in children. The UC would respond to certain messages or post messages on these public forums and provided his UC email account information and "KiK messenger" screen name. "KiK messenger" (herein "KiK") is a free mobile application that permits users to send text messages and other content, including videos and images.

8. On Thursday, January 12, 2017, at approximately 1:27 p.m., the UC received a message from an individual using KiK name, "funshow26", later identified as BRIAN PHILLIP SCHWAN. The message stated, "Hey man I'm a 29 yr old dad, I am not active yet with my

3

daughter as she is to young but will be when she gets old enough. How about you?"[1] The UC responded, "Yes active here how old is your lil one" to which SCHWAN responded, "A year unfortunately I'm thinking when she gets around 4 to get a hj."[2] SCHWAN went on to state, "I can't wait to fuck my daughter….I wanna cum insider her every day…Least twice a day lol". The UC informed SCHWAN that he was sexually active with his purported 9-year-old daughter.

9. During the course of the chat, SCHWAN identified himself as a 29-year-old married male residing in Glen Burnie, Maryland with his wife and daughter. SCHWAN and the UC engaged in a KiK conversation in which SCHWAN discussed his sexual interest in children and his desire to engage in sexual activity with a child.

10. Additionally, SCHWAN sent six Dropbox links to the UC. At the time SCHWAN sent the Dropbox links, the UC was in the District of Columbia. The links were sent to the UC via a cellular telephone application, an instrumentality of interstate commerce. The UC downloaded the links in the District of Columbia.

11. The first link was damaged and unable to be opened. The other remaining five links contained numerous videos and images, including, in the last link, which was entitled, "Bestxxx," 36 videos depicting child pornography. Among those videos, there were videos depicting children as young as infants being sexually assaulted by men and women, including vaginal, anal, and oral penetration of the children. For example, the following videos were contained in the link:

a. A video depicting an adult male forcing his penis in an infant's mouth. The infant is crying and choking, and the male ejaculates on the infant's face.

---

[1] All text abbreviations and typographical errors in quoted text language are original.
[2] Based on his experience and training, the UC understood the abbreviation "hj" to mean a "handjob" or manual stimulation of the defendant's penis.

4

      b.      A video depicting an adult female sucking the bare penis of an infant boy.

      c.      A video depicting a male vaginally penetrating a female infant's vagina with his penis.

      12.      In discussing the links he sent, SCHWAN stated that, "…I got some good links now" and indicated that the ages of the children depicted were "Like probably 3+…If not maybe younger can't tell." SCHWAN stated his favorite link was, "That girl giving the hand job says cute face hj….She is so adorable I could cum over her face."

      13.      During the course of the chat Schwan made arrangements to meet the UC in DC for the purpose of engaging in sexually activity with the UC's purported 9 year-old daughter. During the course of the chat Schwan stated the following, "I'd love to do as much as I can with her honestly. I'd love to eat her pussy and ass, get a bj and I'd love to fuck her but that's up to you".

      14.      During the course of the chat, SCHWAN sent a clothed image of his infant daughter. The infant had a birthmark on the top of her head. SCHWAN indicated in the chats with the UC that he wanted to have sexual contact with his own daughter when she was older.

      15.      On Friday January 13, 2017, the UC continued to communicate with Schwan via KIK messenger, during the course of the chat Schwan agreed to meet the UC in DC on Wednesday January 18, 2017, for the purpose of engaging in sexual acts with the UC's purported daughter. Schwan provided his cellular number to the UC,     -6866 and continued to communicate with the UC via text messenger.

      16.      Based on the cellular telephone number provided to the UC, the FBI was able to identify "funshow26" as BRIAN PHILLIP SCHWAN; date of birth:    ; social security number:

; driver's license number:                    , living at residential address           Glen Burnie, MD.

17. Public social media accounts for SCHWAN's wife revealed that SCHWAN has a baby daughter as indicated in the chats by SCHWAN. The image of the baby on the social media site for ALISA SCHWAN matched the baby images that SCHWAN sent to the UC. The baby in the social media page had the same birthmark as depicted in the photo sent to the UC by SCHWAN.

18. On January 18, 2017, SCHWAN did not arrive at the proposed meeting location, and Agents made a telephone call to the hotel at which SCHWAN was employed and confirmed he was at the location working the morning of January 18, 2016.

19. On January 18, 2017 the UC was contacted by KiK user "sexytime2015", and this user was believed to be SCHWAN. "Sexytime2015" proposed the following exchange for the UC and his purported 9-year-old daughter, "…would u trade cp links if I could see u and her live fucking?"[3] "Sexytime2015" sent the UC more Dropbox links on the KiK application and through Yahoo email address gtn_jamesbond@yahoo.com. The chain of the email communication revealed that "Brian Schwan <fountain_man@yahoo.com>" forwarded the links to gtn_jamesbond@yahoo.com. One of those links contained the same child pornography described above.

20. On January 18, 2017, this Court issued a Federal arrest warrant based on a criminal complaint charging SCHWAN with one count of Distribution of Child Pornography, in violation of Title 18 USC § 2252(a)(2).

---

[3] Based on his experience and training, the UC understood the abbreviation "cp" to mean a "child pornography".

21. On Thursday, January 19, 2017, BRIAN PHILLIP SCHWAN was arrested at his place of employment, . SCHWAN was advised of his legal rights, which he waived, and provided a statement to law enforcement.

22. SCHWAN confirmed to law enforcement that he used the KiK account "funshow26" to communicate with a man in Washington D.C. regarding having sexual contact with the man's daughter. SCHWAN also sent the man several Dropbox links that contained child pornography. SCHWAN confirmed the link contained images of toddler children engaging in sex acts. SCHWAN stated that he did not travel to Washington D.C. to go through with the meeting, but after he failed to appear, SCHWAN contacted the man using a new KiK user name of "sexytime2015". SCHWAN confirmed the conversation with the man was an offer to provide child pornography in exchange for watching the man have sex with his minor daughter.

23. On Friday, January 20, 2017, ALISA SCHWAN contacted the FBI and stated she found a tablet that her husband, BRIAN SCHWAN, used, and she wanted to turn over the tablet to the FBI. The tablet was collected later that day, and it was entered into evidence at the Washington Field Office Evidence Control Room.

24. On January 30, 2017, ALISA SCHWAN contacted the FBI and advised that while she was looking for tax information on BRIAN PHILLIP SCHWAN's email account, she found email communication between him and another person in which BRIAN SCHWAN was making arrangements to meet with this person and their child for sex in Bradenton, FL. ALISA advised this email communication was dated sometime in June of 2016, and they lived in Florida at the time. ALISA stated her husband's email account was schwanb@yahoo.com.

25. Pursuant to Title 18, United States Code, Section 2703(f), preservation requests to YAHOO, INC. were submitted for email addresses "gtn_jamesbond@yahoo.com", "fountain_man@yahoo.com", and "schwanb@yahoo.com".

26. Because SCHWAN reported to law enforcement officers that he used different communication platforms to distribute Dropbox links containing child pornography, there is probable cause to believe that the accounts listed in *Attachment A*, which are capable of storing such information, contain images and videos of child pornography and/or evidence that SCHWAN solicited, received, produced, and/or distributed child pornography.

## BACKGROUND CONCERNING E-MAIL

27. In my training and experience, I have learned that Yahoo, Inc. provides a variety of on-line services, including electronic mail ("e-mail") access and cloud storage, to the public. Yahoo, Inc. allows subscribers to obtain e-mail accounts at the domain name yahoo.com, like the e-mail account listed in Attachment A. Subscribers obtain an account by registering with Yahoo, Inc. During the registration process, Yahoo, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Yahoo, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo, Inc. subscribers) and information concerning subscribers and their use of Yahoo, Inc. services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

28. In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and

other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, your Affiant knows that this information often nevertheless provides clues to their identity, location, or illicit activities.

29.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

30.     In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may

constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

      31.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each offense-element, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, email providers typically log the IP addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Finally, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or

consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## DEFINITIONS

32. Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any adversary that can see the ciphertext

should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

      d.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

      e.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

      f.      "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

      g.      "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

      h.      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar

computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      i.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      j.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

      k.      "Computer-related documentation" means written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

l.      "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address. For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

n.      "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the

subscriber typically creates a password for the account.  By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

    o.    "Minor" means any person under the age of eighteen years.  *See* 18 U.S.C. § 2256(1).

    p.    A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

    q.    A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  The router is in turn typically connected to a modem.

    r.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  *See* 18 U.S.C. § 2256(2).

    s.    "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  <u>See</u> 18 U.S.C. § 2256(5).

    t.    "Website" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language

(HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

u. "Wireless network" as used herein means a system of wireless communications in which signals are sent and received via electromagnetic waves such as radio waves. Each person wanting to connect to a wireless network needs a computer which has a wireless network card that operates on the same frequency. Many wired networks base the security of the network on physical access control, trusting all the users on the local network. But, if wireless access points are connected to the network, anyone in proximity to the network can connect to it. A wireless access point is equipment that connects to the modem and broadcasts a signal. It is possible for an unknown user who has a computer with a wireless access card to access an unencrypted wireless network. Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

v. "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that file. It is computationally infeasible for two files with different content to have the same SHA 1 hash value. By comparing the hash values of files, it can be concluded that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty. There is no known instance of two different child pornographic images or videos having the same SHA1 hash value.

w. "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to set up files on a computer to be shared with other computer users running compatible P2P software. A user may obtain files by opening the P2P

software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network. However, a tool used by law enforcement restricts the download so that the file is downloaded, in whole or in part, from a single user on the network.

1. When a user wishes to share a file, the user adds the file to his a shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's SHA 1 has value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

2. Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

### **CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS**

33. Based on my review of the files of similar FBI investigations and conversations that I have had with other federal agents and law enforcement officers, I know that child pornography is not readily available in retail establishments. Accordingly, individuals who wish to obtain child pornography usually do so by ordering it from abroad or by discreet contact, including through the use of the Internet, with other individuals who have it available or by accessing web sites containing child pornography.

34. Collectors of child pornography typically retain their materials and related information for many years. Most collectors of child pornography seek to increase the size of their

collections in a manner similar to collectors of coins, stamps, or rare books. Many retain these materials, including information regarding sources, for their entire adult lives. Moreover, individuals who distribute and/or collect child pornography generally prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Additionally, collectors of child pornography rarely destroy correspondence from other collectors or distributors unless their activities are detected by law enforcement or other authorities.

35. Collectors of child pornography often correspond and/or meet with others to share information and materials, rarely destroy correspondence from other child pornography distributors or collectors, conceal such correspondence and sexually explicit material, and often maintain lists of names, addresses, telephone numbers, and screen names of individuals with whom they have been in contact and who share the same interests in child pornography.

36. Accordingly, information used to support probable cause is less likely to be stale because collectors and traders of child pornography are known to store and retain their collections and correspondence with other collectors and distributors for extended periods of time. The United States Court of Appeals, Second Circuit has noted that, "[w]hen a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that 'images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes.'" *United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) (quoting *United States v. Lamb*, 945 F. Supp. 441, 459-60 (N.D.N.Y. 1996) (collecting cases)). In *Irving*, the Second Circuit upheld a search based upon information that was approximately 22 months old, noting that, although the affidavit disclosed that the defendant took care to destroy inappropriate photographs, "there was a fair probability that child pornography would be found…" *Id*. Thus,

information used to support probable cause in child pornography cases is often not deemed stale, even if somewhat old, because collectors and traders of child pornography are known to store and retain their collections and correspondence related to their collections for extended periods of time.

37. Additionally, based on information from other law enforcement officers, I know that persons who collect and distribute child pornography:

a. Frequently collect sexually explicit materials in a variety of media, such as photographs, magazines, motion pictures, video tapes, books, slides, and/or drawings or other visual media that they use for their own sexual arousal and gratifications.

b. May receive sexual gratification, stimulation, and satisfaction from actual physical contact with children and/or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (in person, in photographs, or in other visual media) or from literature describing such activity.

## **CONCLUSION**

38. Based on the foregoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo, Inc. who will then compile the requested

records at a time convenient to it, there exists reasonable cause to permit the execution for the requested warrant at any time in the day or night.

_____
Special Agent Laura R. Calvillo
Federal Bureau of Investigation

Sworn and subscribed before me
this \_\_\_\_ day of February, 2017

_____
Honorable G. Michael Harvey
United States Magistrate Judge